# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | 1:09CV27 |
| T-N-T CARPORTS, INC., | ) ) | |
| Defendant. | ) ) | |

## RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE

This matter comes before the Court on the motion for summary judgment filed by Defendant T-N-T Carports, Inc. ("T-N-T"). (Docket No. 40.) Plaintiff Equal Employment Opportunity Commission ("EEOC") has responded in opposition. (Docket No. 42.) Defendant T-N-T filed a reply. (Docket No. 43.) For the reasons that follow, this Court recommends that Defendant T-N-T's motion be granted and that this action be dismissed with prejudice.

## FACTUAL AND PROCEDURAL BACKGROUND

The EEOC brings this action on behalf of Brenda Thompson who claims that she was subjected to a hostile work environment at T-N-T Carports, Inc., because of her Christian religion in violation of Title VII of the Civil Rights Act of 1964 and 42 U.S.C. § 1981a. (Docket No. 1, Complaint ("Compl.") at 1.) Defendant now argues that summary judgment

should be granted in its favor, after discovery, because (1) Plaintiff cannot prove that the conduct she complains of was "because of" religion, (2) the conduct was not sufficiently severe or pervasive to alter the conditions of employment, and (3) the conduct is not imputable to Defendant. (Docket No. 43 at 1.)

The factual record shows that Brenda Thompson worked at T-N-T from 2003 until April 2007 as a customer sales representative. (Docket No. 41, Def.'s Br. in Supp. of Mot. for Summ. J., Ex A, Deposition of Brenda H. Thompson ("Brenda Thompson Dep.") at 8, 75-77.) Amy Thompson, Brenda's daughter-in-law, began work at T-N-T in the Fall of 2005, also as a customer sales representative ("CSR"). (*Id.*, Ex. D, Deposition of Amy Thompson ("Amy Thompson Dep.") at 9-10.) There were several other CSRs who worked in cubicles in the same large room with Brenda and Amy Thompson. Kathy Jones was initially the supervisor of the sales representatives, but she was later replaced by Javier Rubio. Brenda Thompson testified in her deposition that she was "all friends" with her co-workers at T-N-T prior to the time that Amy Thompson began working there. (Brenda Thompson Dep. at 101.) Amy Thompson initially handled the carport sales for the state of Alabama but later switched to the sales for North Carolina. (Amy Thompson Dep. at 10, 34-35.) According to Brenda Thompson, co-worker Debbie Poindexter wanted the North Carolina sales position that Amy Thompson was given. (Brenda Thompson Dep. at 101.) When Amy Thompson received that position instead, Debbie Poindexter "retaliated" against Brenda Thompson by treating her differently than she had previously. (*Id.*)

When Amy Thompson began work at T-N-T, Brenda Thompson was attending the "On The Way Church." (Brenda Thompson Dep. at 38.) Before Amy started work at T-N-T and after that time, Brenda Thompson invited several co-workers to attend church services with her. (*Id*.) Co-workers July Lawson and Kathy Jones accepted invitations and attended services at the On The Way Church. (*Id*. at 38-39.)

Brenda Thompson testified that Debbie Poindexter was the leader of a group of co-workers that included Juanita Noah, Tracy Gunter, Judy Lawson, and Alicia Pack. (Brenda Thompson Dep. at 99.) These co-workers "liked to follow whatever Debbie liked to do." (*Id*.) However, Brenda Thompson testified that these other co-workers, unlike Debbie Poindexter, never said anything to her critical of her church or faith. (*Id*.)

The harassing treatment that Brenda Thompson received from Debbie Poindexter and other co-workers took several different forms, according to Brenda Thompson. The first instance of anything being said that Brenda Thompson considered critical of or insulting to her religious faith was when Debbie Poindexter said to her, "What kind of a church do you go to? Is it a cult? Do you all worship the devil over there?" (*Id*. at 47-48.) Brenda Thompson replied by stating, "Debbie, leave me alone." (*Id*. at 48.)

Brenda Thompson testified about what she thought "led up to" this question from Debbie Poindexter. (*Id*.) According to Brenda, she sent Kathy Jones "certain orders" for carports that were too "big" for her to figure, and Debbie Poindexter upon overhearing such a transfer would pick up her phone and call co-worker Joan to comment on Brenda

Thompson "sending [Kathy] another order." (*Id*. at 48-49.) On the day in question, Brenda Thompson stated that she got up and went into Kathy Jones' office to tell Kathy that she couldn't do her job because Debbie "will not leave [her] alone." (*Id*.) At the time that Brenda Thompson reached Kathy Jones' office, Debbie Poindexter "storm[ed] through the door" of Kathy Jones' office, asking if they were talking about her. (*Id*.) Kathy Jones told Debbie Poindexter to go back to her seat and left to get Javier Rubio who was then the supervisor of the CSRs. (*Id*. at 50.) It was at this moment that Debbie Poindexter asked the "cult" and "devil worshiper" question. (*Id*.) Brenda Thompson "assumed" that Debbie Poindexter wanted to fight because Poindexter was "going, 'Come on.'" (*Id*.) Kathy Jones came back without Javier Rubio, and the situation ended when Brenda Thompson returned to her desk. (*Id*. at 51.)

The second instance of harassment cited by Brenda Thompson also involved Debbie Poindexter. Amy Thompson was going to build a house, and when Brenda Thompson saw a particular house plan in Amy's book that she liked, Brenda copied that drawing and put it up in her cubicle. (*Id*. at 52.) When Debbie Poindexter saw the drawing she stopped and said, "Are you crazy?. . . Do you think God is going to drop this house out of the sky into your lap?" (*Id*.) Brenda Thompson ignored the remark. (*Id*. at 53.) This remark was made about a week after the cult-devil worshiper incident. (*Id*.)

There were no further incidents with Debbie Poindexter, but Brenda Thompson also complains of the conduct of Juanita Noah. Ms. Noah would "talk, she would speak cuss

words if she saw [Ms. Thompson] reading the Bible" or saw a Bible on Kathy Jones' desk. (*Id*. at 55-56.) Sometimes she would "come in" and tell Kathy, "I've got a damn customer on the phone." (*Id*. at 56.) About three times over a month, Juanita Noah would speak a litany of 5 or 6 curse words, often not directed to Brenda Thompson but within her range of hearing. (*Id*. at 56-57.) These occasions occurred after the incidents with Debbie Poindexter. (*Id*. at 57.) Ms. Thompson testified that Tracy Gunter, Judy Lawson, and Alicia Pack used offensive or swearing words every day. (*Id*. at 168.)

Another incident that Brenda Thompson describes relates to a "Christmas picture." A picture of Brenda Thompson was put up in Juanita Noah's cubicle, and on her picture someone had drawn a long tongue, horns and a tail. (*Id*. at 64.) Brenda Thompson heard of this picture but did not see it. (*Id*.)

Brenda Thompson also describes incidents when she, Amy and Kathy Jones were excluded from office parties arranged by Debbie Poindexter. (*Id*. at 71.) Brenda Thompson stated that she felt humiliated and that she was being laughed at by Debbie Poindexter and other co-workers. (*Id*. at 71-72.) Brenda felt excluded, and testified that "if it wasn't about religion, it was just like bullies at school." (*Id*. at 72.)

Brenda Thompson testified concerning the talk in the office of a sex toy party to be held at Tracy Gunter's house. (*Id*. at 73.) She said that she overheard Ms. Gunter, Juanita Noah, Judy Lawson, Alicia Pack, and Debbie Poindexter discussing what would happen at the party. (*Id*.) Ms. Thompson also testified that two to three times a week one of her co-

workers would say something of a sexual nature that she found offensive due to her religion. (*Id*. at 139-40.) For example, Alicia Pack would talk about her boyfriends and compare the size of their penises, while Judy Lawson would speak of having sex with one of her ex-husbands and how good it was. (*Id*. at 140.) In addition, Ms. Thompson was not invited to an un-official, off-premises going-away luncheon for an office employee on one occasion. (*Id*. at 74.) There was nothing said that indicated the reason Ms. Thompson was not invited was due to her religion or church. (*Id*. at 75.)

Demonstrating the general factional nature of the T-N-T workplace while she was there, Ms. Thompson testified that during break times she, Amy, and Kathy Jones would gather in the break room. (*Id*. at 112.) On the other hand, Debbie Poindexter and "the others" would take their breaks with Debbie in her cubicle. (*Id*.) Before Amy received the North Carolina sales job, all of the workers had gathered together and even Amy and Debbie Poindexter would go to lunch together. (*Id*. at 113.)

According to Brenda Thompson, the one incident during which Debbie Poindexter used the words "cult member" and "devil worshiper" was religious harassment. (*Id*. at 114.) On the other occasions when Ms. Thompson felt there was a conflict between them it was due to Ms. Poindexter's resentment that Amy Thompson had received the North Carolina sales job. (*Id*.)

Brenda Thompson stated that she complained of these events to her supervisor, the human resources manager, and higher management at T-N-T on several occasions.

Debbie Poindexter testified in her deposition that at first she had a friendly relationship with Brenda and Amy Thompson. (Docket No. 41, Ex. B, Deposition of Deborah K. Poindexter ("Poindexter Dep.") at 22.) Ms. Poindexter "go[es] to the church" and reads the Bible. (*Id*. at 64.) When Amy first came to work, Amy, Ms. Poindexter, Brenda Thompson, and Brenda's boyfriend (who also worked at T-N-T) would all go out to lunch together. (*Id*. at 23.) However, according to Ms. Poindexter, Amy "felt like she was better than the rest of us." (*Id*. at 22.) Ms. Poindexter said that Brenda changed in character when Amy started working at T-N-T, and turned from a friendly person to one who was more "tight-knit" with Amy. (*Id*. at 23.) Although Ms. Poindexter recounted having verbal disagreements with Brenda and Amy, she did not recall that any of them were related to religion or religious beliefs. (*Id*. at 31, 32, 36, 37.) Ms. Poindexter denied having asked whether Brenda Thompson's church was a cult. (*Id*. at 32.)

Kathy Jones recalled seeing the Christmas pictures of Brenda and Amy Thompson in Juanita Noah's cubicle. (Docket No. 41, Ex. C, Deposition of Kathryn P. Jones ("Kathy Jones Dep.") at 85.) Someone had drawn horns, a tongue, a pitchfork, and devil tail with a red marker on the pictures of Brenda and Amy Thompson. (*Id*.)

Amy Thompson also believed that "things started really getting bad for [her]" when she became responsible for North Carolina sales. (Amy Thompson Dep. at 35.) Her assignment "made a few people mad." (*Id*.) According to Amy Thompson, Debbie

Poindexter in particular became angry because she thought the North Carolina position would be a "step to managership" for her. (*Id*.)

Tracy Gunter testified upon deposition that there was no conflict among her co-workers until "towards the end" when Brenda Thompson left T-N-T. (Docket No. 41, Ex. E, Deposition of Tracy Gunter ("Tracy Gunter Dep.") at 20.) She described tension in the office resulting from comments that were made. (*Id*.) Ms. Gunter said that Amy and Brenda Thompson were friends with supervisor Kathy Jones, and they received preferential treatment because of that relationship. (*Id*. at 22.) Ms. Gunter heard Juanita Noah use curse words in the office on a daily basis. (*Id*. at 32.) Ms. Gunter admitted that she drew on the picture of Amy Thompson which was hanging in Juanita Noah's cubicle. (*Id*. at 34.) However, she said that she drew a beard instead of devil horns. (*Id*. at 33-34.) Ms. Gunter stated that she was just "doodling" when she drew upon that picture and that such drawings were done to her picture and pictures of her co-workers. (*Id*. at 35.) Ms. Gunter is a Christian. (*Id*. at 24.)

Juanita Noah testified that she had pictures of most all of her co-workers in her cubicle. (Docket No. 41, Ex. F, Deposition of Juanita R. Noah ("Juanita Noah Dep.") at 48.) She stated that she remembered only the picture of Amy Thompson, not Brenda Thompson, being drawn upon, but she could not remember what was drawn. (*Id*.) She also testified that she is a Baptist. (*Id*. at 39.)

Judy Lawson testified that Brenda Thompson had a "U-turn change in attitude" when Amy Thompson started working at T-N-T. (Docket No. 41, Ex. H, Deposition of Judy Carol Lawson ("Judy Lawson Dep.") at 40.) Brenda Thompson was formerly friendly but then "stayed around Amy all the time" once Amy arrived. (*Id*.)

## DISCUSSION

**A.     Summary Judgment Standard**

Summary judgment is appropriate only when no genuine issue of material fact exists. *Shealy v. Winston*, 929 F.2d 1009, 1011 (4th Cir. 1991). A genuine issue of fact exists if the evidence presented could lead a reasonable fact-finder to return a verdict in favor of the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). A court considering a motion for summary judgment must view all facts and draw all reasonable inferences from the evidence before it in a light most favorable to the non-moving party. *Id.* at 255. The proponent of summary judgment "bears the initial burden of pointing to the absence of a genuine issue of material fact." *Temkin v. Frederick Cnty. Comm'rs,* 945 F.2d 716, 718 (4th Cir. 1991) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)). If the movant carries this burden, then the burden "shifts to the non-moving party to come forward with facts sufficient to create a triable issue of fact." (*Id*. at 718-19 (citing *Anderson*, 477 U.S. at 247-48).) A mere scintilla of evidence supporting the non-moving party's case is insufficient to defeat a motion for summary judgment. *See, e.g., Shaw v. Stroud*, 13 F.3d

791, 798 (4th Cir. 1994); *see also Anderson*, 477 U.S. at 248 (non-moving party may not rest upon mere allegations or denials.)

**B.     Elements of Claim**

In order to prove that Brenda Thompson suffered from a hostile work environment based upon religion, the EEOC must demonstrate that the harassment was: (1) unwelcome; (2) because of religion; (3) sufficiently severe or pervasive to alter the conditions of employment and create an abusive atmosphere; and (4) imputable to the employer. *E.E.O.C. v. Sunbelt Rentals, Inc.*, 521 F.3d 306, 313 (4th Cir. 2008). Defendant's summary judgment motion puts the last three elements of Plaintiff's claim at issue. (Docket No. 41 at 1.)

**1.     Because of Religion**

The "because of religion" element of a claim for hostile work environment recognizes that to violate Title VII the harassment must be based on Brenda Thompson's religion. *Sunbelt Rentals*, 521 F.3d at 314. To survive summary judgment, the EEOC must present sufficient evidence that the harassing conduct "'was motivated by [religious] animosity.'" *Id*. (quoting *Gilliam v. South Carolina Dep't of Juvenile Justice*, 474 F.3d 134, 142-43 (4th Cir. 2007)).

Brenda Thompson complains of the following harassing conduct: (1) the cult/devil worship question asked by Debbie Poindexter in Kathy Jones' office; (2) the photograph of Brenda and/or Amy Thompson, defaced with devil horns; (3) the sexually-themed discussions among co-workers at T-N-T; (4) the profanity used by co-workers at T-N-T; (5)

the comment by Debbie Poindexter regarding a drawing of a house which Brenda Thompson had displayed in her cubicle; and (6) the social isolation experienced by Brenda Thompson at work.

With respect to the conduct of Debbie Poindexter, Brenda Thompson stated in her deposition that *only* the cult/devil worshiper question asked by Ms. Poindexter "was religious harassment." (Brenda Thompson Dep. at 114.) She testified that on other occasions when she felt a conflict with Ms. Poindexter, the conflict was due to the fact that Amy Thompson rather than Ms. Poindexter had received the service representative position for North Carolina. (*Id*.)

On review, the Court concludes that there is insufficient evidence in the record for a jury to reasonably conclude that the sexually-themed discussions and the use of profanity among Ms. Thompson's co-workers were made "because of" Brenda Thompson's religion. The EEOC points to no evidence that the use of profanity or the sexually-themed discussions increased in frequency during the time period of which Ms. Thompson is complaining. To the contrary, the evidence shows that swearing and sex-talk were long-standing, daily occurrences in the office. In addition, such language was heard by everyone in the workplace, not only Brenda Thompson. (*See* Brenda Thompson Dep. at 73 (Brenda Thompson "overheard discussions" of sex toy party among co-workers); Gunter Dep. at 32-33 (describing overhearing Juanita Noah using curse words in her cubicle on a daily basis); Belton Dep. at 35 (describing counseling session with Juanita Noah regarding her bad

-11-

language with customers on phone).) Brenda Thompson was offended by such language due to her strong religious beliefs; however, the evidence is not sufficient for a reasonable jury to attribute the use of such language by co-workers to animosity or hostility to Brenda Thompson's religion. *See Rivera v. Puerto Rico Aqueduct and Sewers Auth.*, 331 F.3d 183, 190 (1st Cir. 2003) (pointing to "conceptual gap" between offensive work environment due to one's strong religious beliefs and an "environment that is offensive because of hostility to the religion guiding those sensibilities").

There also is insufficient evidence in the record for a jury to conclude that the social isolation experienced by Brenda Thompson was "because of" her religion. The record clearly shows that a schism developed between Kathy Jones and Brenda and Amy Thompson on one hand, and Debbie Poindexter, Juanita Noah, Tracy Gunter, Alicia Pack, and Judy Lawson on the other. However, the cause of that schism was attributed by the participants to specific reasons other than Brenda Thompson's religion. These reasons include Brenda Thompson's close association with Amy Thompson and Kathy Jones, as well as the resentment of Debbie Poindexter, the de facto leader of the second group, as a result of Amy Thompson's assignment to North Carolina sales. (*See* Judy Lawson Dep. at 40; Amy Thompson Dep. at 35.)

This leaves only the one-time cult/devil worshiper questioning of Brenda Thompson by Debbie Poindexter, the alleged drawing of devil-like features upon the photograph of Brenda Thompson, and the comment regarding God not dropping a house into Brenda's lap

as remaining possible instances of harassing conduct "because of" Brenda Thompson's religion.[1]

### 2. Sufficiently Severe or Pervasive

The "severe or pervasive" element of a hostile environment claim has both subjective and objective components. *Sunbelt Rentals*, 521 F.3d at 315. The EEOC must show that Brenda Thompson subjectively perceived her environment to be abusive and that a reasonable person in her position would have found the environment objectively hostile or abusive. *Id*. With regard to the objective component, the factors to be examined to determine if the environment was hostile or abusive include the frequency of the conduct, its severity, whether it was physically threatening or humiliating or a mere offensive utterance, and whether it unreasonably interfered with an employee's work performance. *Id*. Title VII does not establish a general civility code for the American workplace. *Id*. To be actionable, the harassing conduct must be so extreme as to amount to a change in the terms and conditions of employment. *Id*. In the Fourth Circuit, plaintiffs "must clear a high bar in order to satisfy the severe or pervasive test." *Id*.

---

[1] Brenda Thompson's own deposition testimony limited her claim of verbal religious harassment by Debbie Poindexter to the cult/devil-worshiper questioning, and attributed other remarks by Ms. Poindexter to her resentment over Amy Thompson's favorable job assignment. Nonetheless, for the sake of completeness, the Court has considered Ms. Poindexter's comments regarding "God not dropping a house" as an incident of religious harassment.

In determining whether religiously-harassing conduct created an abusive or hostile work environment, the conduct is viewed in its totality under all the circumstances which includes the social context in which the behavior occurred and was experienced by the complainant. *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81 (1998).

The instances of alleged harassment which a reasonable jury could consider in this case are limited to the cult/devil worshiper question, the drawing with devil-like features, and the house comment. These were three discrete instances of conduct that were not extended. Although the other complaints raised by Brenda Thompson may have affected her working environment, they were not circumstances caused by hostility to her religion. These three instances of harassing conduct based on religion may not be described as frequent or severe. Although Brenda Thompson testified that she thought Debbie Poindexter was going to assault her during the cult/devil worshiper incident, there is no evidence that Ms. Poindexter physically threatened Ms. Thompson. The EEOC has also not produced evidence that *these* instances had any significant negative impact on Ms. Thompson's ability to do her job. Although Ms. Thompson ultimately abandoned her job after not being invited to a party, it is not disputed that the human resources manager, Joan Belton, asked her to return to work and commented that Ms. Thompson was a "good worker." (Brenda Thompson Dep. at 153.) The evidence does not reveal a religiously hostile work environment "pervaded with discriminatory conduct 'aimed to humiliate, ridicule, or intimidate.'" *Sunbelt Rentals*, 521

F.3d at 316 (quoting *Jennings v. Univ. of North Carolina*, 482 F.3d 686, 695 (4th Cir. 2007) (en banc)).

Because the EEOC has not demonstrated a genuine issue of material fact on essential elements of its claim, Defendant's motion for summary judgment should be granted.[2]

## CONCLUSION

For the foregoing reasons, **IT IS RECOMMENDED** that Defendant's motion for summary judgment (Docket No. 40) be granted and that this action be dismissed with prejudice.

/s/ P. Trevor Sharp
United States Magistrate Judge

Date: February 4, 2011

---

[2] The Court need not address the final element, whether the harassing conduct would be imputable to Defendant.