IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| EQUAL EMPLOYMENT ) | | |
| OPPORTUNITY COMMISSION ) | | |
| ) | | |
| Plaintiff, ) | | |
| ) | | |
| v. ) | 1:09-cv-27 | |
| ) | | |
| T-N-T CARPORTS, INC., ) | | |
| ) | | |
| Defendant. ) | | |

## **MEMORANDUM OPINION AND ORDER**

CATHERINE C. EAGLES, District Judge.

The Equal Employment Opportunity Commission ("EEOC") filed suit against T-N-T Carports, Inc. ("T-N-T"), alleging that T-N-T allowed a hostile work environment to exist against one of its former employees, Brenda Thompson, in violation of Title VII of the Civil Rights Act of 1964, as amended. (Doc. 1.) T-N-T has moved for summary judgment. (Doc. 40.) On February 4, 2011, in accordance with 28 U.S.C. § 636(b), the magistrate judge recommended that T-N-T's motion be granted ("Recommendation") (Doc. 44), and notice was served on the parties (Doc. 45). Within the time limits prescribed in § 636(b)(1)(C) and Federal Rule of Civil Procedure 72(b), the EEOC filed objections to the Recommendation (Doc. 46), and T-N-T filed a response (Doc. 52). The Court has reviewed the portions of the Recommendation to which the EEOC objected and has made a *de novo* determination. *See* 28 U.S.C. § 636(b)(1)(C). For the reasons set forth below, the Court rejects the Recommendation and denies T-N-T's motion for summary judgment.

## I. FACTUAL BACKGROUND

The evidence will be viewed in the light most favorable to the EEOC, the non-moving party.

Brenda Thompson is a lifelong Christian who belongs to a Full Gospel Evangelical church. (Doc. 55, B. Thompson Dep. at 30.) She began working at T-N-T in 2003 as a customer sales representative. (*Id*. at 8.) Brenda Thompson's daughter-in-law, Amy Thompson, was hired by T-N-T in fall 2005 as a customer sales representative. (Doc. 54, A. Thompson Dep. at 9.)

Some months later, Amy Thompson received a new work assignment that a co-worker, Debbie Poindexter, wanted. (Doc. 53, Jones Dep. at 75-76.) Immediately thereafter, Poindexter began to harass and bully Amy and Brenda Thompson and Kathy Jones, the person who had given Amy the new work assignment. (*Id*. at 79.) Poindexter also solicited and encouraged other co-workers to join her in her efforts to socially isolate Amy and Brenda Thompson and Kathy Jones. (*Id*. at 102, 105-07.)

While much of this campaign involved conduct unrelated to religion, Poindexter and her cohorts also used Brenda Thompson's religious faith as part of their harassment. Poindexter and other co-workers were aware of Brenda Thompson's religion. (Doc. 42 ex. 7, Poindexter Dep. at 20; Doc. 42 ex. 6, Noah Dep. at 36-37; Doc. 42 ex. 4, Gunter Dep. at 23-24.) On one occasion, Poindexter yelled at Brenda Thompson, saying she belonged to a "cult" and asking if she worshipped the devil. (Doc. 55, B. Thompson Dep. at 50.) Poindexter's words and manner were so aggressive that Jones believed Poindexter was about to physically attack Brenda Thompson (Doc. 53, Jones Dep. at 81), and Brenda Thompson believed Poindexter wanted to fight (Doc. 55, B. Thompson Dep. at 50). Jones tried to get a T-N-T supervisor, Javier Rubio, to intervene,

but Rubio just smiled and provided no assistance. (Doc. 53, Jones Dep. at 81.) The incident left Thompson "crying" and "shaking." (Doc. 54, A. Thompson Dep. at 46.)

On a separate occasion about a week later, Poindexter denigrated and distorted Brenda Thompson's religious views in a conversation about Amy Thompson's house. She called Brenda "crazy" and said "[d]o you think God is going to drop this house out of the sky into your lap?" (Doc. 55, B. Thompson Dep. at 52-53.)

The harassing behavior was not limited to Poindexter. Another co-worker, Tracy Gunter, drew devil horns, a devil tail, and a pitchfork on a Christmas picture of Brenda Thompson which was posted in a cubicle and seen by other co-workers.[1] (Doc. 53, Jones Dep. at 85; Doc. 41, Gunter Dep. at 33-34.) Juanita Noah, another co-worker, also engaged in a pattern of using profanity with religiously offensive overtones in front of Brenda Thompson (Doc. 55, B. Thompson Dep. at 55-56), often followed by a mock apology directed at Brenda. (Doc. 54, A. Thompson Dep. at 18-19; Doc. 53, Jones Dep. at 110-11.) Noah also would pick up Kathy Jones's Bible and "slam" it down while cursing, with the specific intention to offend Jones and Brenda Thompson. (Doc. 53, Jones Dep. at 110-11.) Co-workers also made fun of Amy Thompson for having bible verses on a white board in her cubicle. (Doc. 54, A. Thompson Dep. at 12-18.)

Brenda Thompson complained to T-N-T supervisors consistently about the harassing conduct of her co-workers. After Poindexter accused Thompson of belonging to a cult and calling her a devil worshipper, she complained to Javier Rubio. (Doc. 55, B. Thompson Dep. at 53-54.) Rubio promised to get rid of Poindexter or to move Thompson. (*Id*. at 54.) Rubio

---

[1] Gunter testified that she only drew a beard on Brenda Thompson's picture. (Doc. 41, Gunter Dep., at 33-34.) However, Jones testified that it was devil horns, a devil tail, and a pitchfork. (Doc. 53, Jones Dep. at 85.) For the purposes of this memorandum opinion and order, the Court will take the facts in the light most favorable to the EEOC.

3

neither let Poindexter go nor moved Thompson.  (*Id*. at 110.)  Thompson complained to Joan Belton twice about the harassment from Poindexter and asked to be moved.  (*Id*. at 69-70.)  Belton instead advised Thompson to take a walk around the building whenever she was frustrated with Poindexter.  (*Id*. at 70.)  Thompson also complained to Rubio about the use of profanity by Juanita Noah.  (*Id*. at 59.)  Rubio told Thompson to "pay no attention to it."  (*Id*.)  After pictures of Amy and Brenda Thompson were defaced with imagery of the devil, Brenda Thompson asked Rubio whether he was going to do anything about the religious harassment.  (*Id*. at 65.)  Rubio laughed and advised Thompson to "[j]ust pay no attention to it."  (*Id*.)

Amy Thompson and Brenda Thompson both complained to Joan Belton about the harassing conduct.  (*Id*. at 106; Doc. 54, A. Thompson Dep. at 37.)  Amy Thompson and Brenda Thompson also jointly complained to Arturo Lopez.  (*Id*.)  Ultimately, Brenda Thompson asked to be moved some five separate times.  (*Id*. at 172-73.)

The harassment affected both Brenda Thompson and Amy Thompson personally.  Brenda Thompson testified that the harassment caused sleeplessness and resulted in a "feeling of dread" (*Id*. at 159-60) and that Amy Thompson left T-N-T because of the religious harassment (*id*. at 105).  Another co-worker, Barbara Bowman, felt so badly about the harassment that she cried over it.  (*Id*. at 171.)  Brenda Thompson eventually resigned from her position at T-N-T.  (*Id*. at 75-77.)

## II. DISCUSSION

### A. Summary Judgment Standard

Summary judgment is proper if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The initial burden is on the movant to show the absence of a genuine dispute of material fact.  *Id.*; *Temkin v.*

*Frederick Cnty. Comm'rs*, 945 F.2d 716, 718 (4th Cir. 1991). If that burden is met, the nonmovant then must show that there is a genuine dispute of material fact and present more than a mere scintilla of evidence supporting the nonmovant's case. *See Shaw v. Stroud*, 13 F.3d 791, 798 (4th Cir. 1994).

### B. Religious Harassment Claim

Title VII makes it unlawful for an employer "to discriminate against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's . . . religion." 42 U.S.C. § 2000e-2(a)(1). "Since an employee's work environment is a term or condition of employment, Title VII creates a hostile working environment cause of action." *EEOC v. R&R Ventures*, 244 F.3d 334, 338 (4th Cir. 2001) (citing *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 73 (1986)).

In order to prevail at trial, EEOC must show that Brenda Thompson was subject to a hostile work environment that was "(1) unwelcome; (2) because of religion; (3) sufficiently severe or pervasive to alter the conditions or terms of employment; and (4) imputable to the employer." *EEOC v. Sunbelt Rentals, Inc.*, 521 F.3d 306, 313 (4th Cir. 2008). T-N-T agrees that the conduct at issue was unwelcome. (Doc. 41 at 1.) Thus, the court will focus on the remaining three elements.

#### 1. Because of Religion

T-N-T argues that the motivation for the harassment of Brenda Thompson was not religious, but rather arose from jealousy after her daughter-in-law received a preferable work assignment. T-N-T relies on *Rivera v. Puerto Rico Aqueduct and Sewers Authority*, 331 F.3d 183 (1st Cir. 2003), in which the court held that when the record established that the conduct at issue was "merely tinged" with religious overtones and that a "constellation of factors" other

5

than religious animosity led to the friction between plaintiff and her co-workers, summary judgment for the defendant was appropriate. 331 F.3d at 189, 191.

*Rivera* is generally consistent with Fourth Circuit case law requiring evidence that the harassment "'was motivated by religious animosity.'" *Sunbelt Rentals*, 521 F.3d at 318 (quoting *Gilliam v. S.C. Dep't of Juvenile Justice*, 474 F.3d 134, 142-43 (4th Cir. 2007)); *cf. Hoyle v. Freightliner*, __ F.3d __, 2011 U.S. App. LEXIS 6628, at *18 (4th Cir. Apr. 1, 2011) (applying a "but for" test in hostile-work-environment cases based on gender discrimination); *Wrightson v. Pizza Hut of Am., Inc.*, 99 F.3d 138, 142 (4th Cir. 1996) (same).

In *Sunbelt Rentals*, there was evidence that coworkers had used religious epithets and religiously derogatory terms when referring to a Muslim employee that "would not have been applied to a non-Muslin employee" and that the Muslim employee had been teased about his appearance and his short prayer sessions. 521 F.3d at 314. The Fourth Circuit found this was "overwhelming evidence" that disrespect for the Muslim religion was "the basis of their conduct" and that summary judgment was not appropriate. *Id*. In contrast, in *Gilliam*, a racial discrimination case, the plaintiff had no evidence of any racial slurs or derogatory comments about race and the court upheld summary judgment. 474 F.3d at 142-43.

The record here does contain evidence of harassing conduct from Brenda Thompson's peers that was not religious in nature, and there is substantial evidence that the underlying motivation was jealousy, not religious animus. However, there is also evidence that Brenda Thompson's co-workers, knowing she was a devout Christian, engaged in conduct that clearly showed religious animosity. This conduct included: (1) suggesting Thompson belonged to a cult and was a devil worshipper; (2) physically intimidating her while simultaneously using derogatory words about her religion; (3) calling Thompson "crazy" about her religious beliefs;

6

(4) drawing devil horns, a devil tail, and a pitchfork on Brenda Thompson's Christmas photo; (5) using profanity followed by mock apologies; and (6) cursing the Bible and teasing about Bible reading. These instances taken together are enough to give rise to an inference that the harassment was motivated by animosity toward Brenda Thompson because of her religion and to establish a disputed question of material fact as to whether the harassment was because of religion.

      **2. Severe or Pervasive**

"Title VII does not establish a 'general civility code for the American workplace.'" *Sunbelt Rentals*, 521 F.3d at 315 (quoting *Oncale v. Sundower Offshore Servs., Inc.*, 523 U.S. 75, 80 (1998)). To be actionable, the harassing conduct has to be "sufficiently severe or pervasive to alter the conditions of her employment and create an abusive work environment." *Bonds v. Leavitt*, 629 F.3d 369, 385 (4th Cir. 2011). In answering the question of whether conduct is severe or pervasive, the court will examine "all the circumstances," "includ[ing] the frequency of the [harassing] conduct; its severity; whether it is physically threatening or humiliating . . . ; and whether it unreasonably interferes with an employee's work performance." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993). In order to prevail at trial, the EEOC must show that Brenda Thompson subjectively perceived her environment to be abusive and that a reasonable person in her position would have found the work environment objectively hostile. *Sunbelt Rentals*, 521 F.3d at 315.

T-N-T contends that because there were only a few instances of overtly religious harassment over a relatively short time span, the hostile work environment was not severe or pervasive. (Doc. 41 at 17.) However, it would be inappropriate simply to count the incidents

and say "six is not enough" or "eight is enough." The nature of the incidents is relevant, as well as the number. *See Harris*, 510 U.S. at 23.

It is clear that Brenda Thompson subjectively perceived the work place to be hostile. While the objective standard is a closer call, the question for summary judgment "is not whether a jury is *sure* to find a verdict for the plaintiff; the question is whether a reasonable jury could rationally so find." *Hoyle*, __ F.3d __, 2011 U.S. App. LEXIS 6628, at *28. As discussed above, there were a number of incidents over time committed by several individuals in a concerted effort to humiliate and demean Brenda Thompson. Amy Thompson and Kathy Jones were also targets of harassing conduct. There is no evidence that the incidents were good-natured teasing. One of the incidents even involved a perceived threat of physical violence that left Brenda Thompson crying and shaking and that caused a co-worker to cry as well. While not necessary, "physical threats undeniably strengthen[] a hostile work environment claim." *White v. BFI Waste Servs.*, 375 F.3d 288, 298 n.6 (4th Cir. 2004).

A reasonable jury could conclude that the harassment of Brenda Thompson was sufficiently severe or pervasive as to alter the terms and conditions of employment and create an abusive work environment.

### 3. Imputable to the Employer

T-N-T is liable for the harassment of its employees "'if it knew or should have known about the harassment and failed to take effective action to stop it.'" *Howard v. Winter*, 446 F.3d 559, 565 (4th Cir. 2006) (quoting *Ocheltree v. Scollon Prods., Inc.*, 335 F.3d 325, 334 (4th Cir. 2003) (en banc)). Knowledge in this context is based on a reasonable person standard. *Sunbelt Rentals*, 521 F.3d at 319. "Once the employer has notice, then it must respond with remedial action reasonably calculated to end the harassment." *Id.* (internal quotation marks omitted).

A reasonable jury could find that T-N-T had notice of the harassment and did not take appropriate action to end it. Brenda Thompson repeatedly complained to superiors about the harassment and suggested simple remedies which were not adopted. Amy Thompson and Kathy Jones also reported the harassment. While the record contains evidence that T-N-T may have engaged in some remedial efforts, it is a matter for the jury to decide whether any efforts by T-N-T were reasonably designed to end the harassment.

Because a reasonable jury from these facts could find that T-N-T knew about and did not take reasonable action to end the harassment, Brenda Thompson's claim survives a motion for summary judgment on this issue.

## III.   CONCLUSION

For the foregoing reasons, **IT IS ORDERED** that Defendant's motion for summary judgment (Doc. 40) is **DENIED**.

This the 9th day of May, 2011.

_____
United States District Judge